A94A2434. COFIELD v. THE STATE.
(455 SE2d 342)

ANDREWS, Judge.

Cofield appeals pro se[1] from his Coweta County conviction of one count each of rape and aggravated sodomy committed on his daughter. He was also convicted of incest, but this charge merged with the rape charge, discussed infra.

1. Viewed with all inferences in favor of the jury's verdict, *Denson v. State*, 212 Ga. App. 883, 885 (4) (443 SE2d 300) (1994), the evidence was that Cofield and D. C.'s mother, Pate, were divorced when D. C. was approximately three years old. Pate had custody of the child, but Cofield had visiting privileges. D. C. visited him regularly until her teenage years. On March 16, 1991, when D. C. was 14 years old, Pike County Deputy Thomas, who specialized in child molestation cases, was riding on regular patrol with another officer. Around 8:00 p.m., a car coming toward the officers was observed to be weaving and they turned around to pull the vehicle over. Cofield was driving and D. C. was in the passenger seat. Cofield had no driver's license and was arrested. Deputy Thomas spoke with D. C., who ap-

---

[1] Cofield was represented by appointed counsel at trial. After conviction, trial counsel's appointment was continued for appeal. Counsel filed a motion for new trial and thereafter Cofield filed a motion to proceed pro se and an amendment to the motion for new trial, alleging ineffectiveness of counsel, addressed infra. The court granted Cofield's motion and he does not contest this portion of the proceedings here. See *Reid v. State*, 235 Ga. 378 (1) (219 SE2d 740) (1975); *Carver v. State*, 198 Ga. App. 676, 677 (1) (403 SE2d 230) (1991).

peared to be very nervous and emotionally upset. She began crying when he told her they had to go to the station. Deputy Thomas believed something was wrong and asked D. C. when they got to the station what her father had been doing that night. D. C. denied anything had happened. When Pate (then McAfee) came to pick up D. C., Deputy Thomas advised her of his suspicions, but Pate did not believe it at the time.

D. C. testified that once in his trailer in Spalding County, after the first incident and before he moved to Coweta County, Cofield also fondled her.

In February 1992, Deputy Thomas was called by Pate and met with her and D. C., at which time D. C. told him about the fondling. The call by Pate had been precipitated by the acts underlying the present charges.

Sometime between Thanksgiving and Christmas 1991, D. C. had gone to visit Cofield and his fiance in Coweta County. They were living in a trailer and the fiance had two sons from a previous marriage who were also staying there. D. C. stated that her mother dropped her off on Saturday afternoon and that evening passed without incident. She said that she slept on the couch in the living room that night and arose around noon on Sunday. Cofield and the two boys were building a clubhouse. Later she and Cofield went to a nearby field and shot rifles at targets. Cofield had been drinking beer and she carried two or three to the field for him and he also took one. The fiance and the boys left and she and Cofield were sitting on the couch watching television when he began rubbing her between her legs, including her vaginal area and also on her breasts. She told him to stop, but Cofield, over six feet tall and 250 pounds,[2] jerked her off the couch and propelled her down the hall to the bedroom and put her on the bed. He said he and the fiance never had sex together and proceeded to remove her clothing and lay on top of her. He was holding her by both wrists and kept attempting to kiss her. He then inserted his penis in her vagina which was very painful. Shortly thereafter, he placed his mouth on her vagina and then lay back down on her. After he rolled off, D. C. got up and left the bedroom. Cofield yelled for her to bring him a towel, which she threw at him from the bathroom. He then began to masturbate. D. C. suffered some vaginal bleeding and she was in pain. She got dressed and lay down on the living room couch. Her wrists were bruised.

When Cofield emerged from the bedroom, he told her he was sorry. The fiance and boys returned and D. C. did not say anything because she was afraid and there was no phone in the trailer. Cofield

---

[2] D. C. was 5′4″ and 110 pounds.

was supposed to take her home that night, which he did. When she arrived home, she went straight to her room and did not tell her mother or reveal her bruises.

Previously an A and B student, D. C.'s grades had begun to fall after the March 1991 incident and thereafter, resulting in F's. Finally, in February 1992, D. C. walked into the kitchen and blurted out to her mother that ". . . daddy is doing bad things to me, make him stop."

The next day, February 10, 1992, the visit to Deputy Thomas and DFACS occurred. As a result of the visit with the deputy, a tape recorder was placed on the mother's phone and Cofield was told by the mother that D. C. needed to talk to him about some school matters and to call, which he did a few days after the meeting. In that call, among other exchanges, are the following:

D. C. stated she had been thinking about "you know about what you been doing to me."

"Cofield: About what now? D. C.: About what you been doing to me. I'm tired of it. Cofield: Oh. D. C.: And you know what I'm talking about. Cofield: Well, don't think about it. D. C.: Can't help it. Cofield: Well forget about it. D. C.: . . . if I was gonna have sex with somebody I'd go out here and have sex with C——, not you. Cofield: Okay. Well don't even think about it. I love you. . . . I'm not never again. That's all you had to tell me a long time ago. . . . And I promise it won't ever happen again. . . ."

D. C. was examined by her family practitioner on February 11, 1992. She testified that D. C. told her Cofield had had intercourse with her before Christmas. Upon examination, although finding no tearing, the doctor concluded that D. C.'s physical condition was consistent with her having previously had intercourse. Also, the doctor testified that bleeding is consistent with a female's first intercourse.

There was evidence sufficient to convince any rational trier of fact of the existence of the essential elements of the crimes of rape and aggravated sodomy, *Jackson v. Virginia*, 443 U. S. 307, 310 (99 SC 2781, 61 LE2d 560) (1979); *Jacobs v. State*, 207 Ga. App. 714, 716 (3) (429 SE2d 256) (1993), despite Cofield's presentation of his now wife's testimony and that of her two sons which conflicted with D. C.'s. The credibility of witnesses is for the jury which here chose to believe the victim. "Appellate courts consider only the sufficiency, and not the weight of the evidence. [Cit.]" *Jacobs*, supra.

2. Cofield's first enumeration is that the court erred in denying his motion to suppress the tape recording. He argues that the facts of D. C.'s recordation do not fall within the second prong of OCGA § 16-11-66 which provides that nothing in § 16-11-62 "shall prohibit the interception, recording, and divulging of a message sent by telephone, . . . in those instances wherein the message is initiated or in-

stigated by a person and the message constitutes the commission of a crime or is directly in the furtherance of a crime, provided at least one party thereto consents."[3] Here, unlike *Dobbins v. State*, 262 Ga. 161, 162 (2) (415 SE2d 168) (1992), there was consent by both D. C. and her mother for the recordation. Instead, Cofield contends that the conversation was not the commission of a crime or in furtherance of a crime. "Contrary to [these] contentions, the conversation 'may be considered in direct furtherance of such crimes as knowingly falsifying, concealing, or covering up a material fact in a matter "within the jurisdiction of any department or agency of state government . . ." (OCGA § 16-10-20), and hindering the apprehension of a criminal (OCGA § 16-10-(50)). . . .' [Cits.]" *Legg v. State*, 207 Ga. App. 399, 400 (1) (428 SE2d 87) (1993).

There was no error in denying the motion and admitting the tape recording.

3. The next enumeration is that the court erred in not directing a verdict for Cofield on the incest charge, since it is argued that charge merged with the rape charge. The court properly denied the motion for directed verdict on that ground, since " '[u]nder OCGA §§ 16-1-6 and 16-1-7, a defendant may be *prosecuted* for two crimes based on the same conduct, but he may not be *convicted* of more than one crime if one crime is included in the other.' [Cit.]" (Emphasis supplied.) *Padgett v. State*, 205 Ga. App. 576, 578 (1) (423 SE2d 411) (1992). Here, the court's sentence states "Life on Ct. I, (20) yrs. on Ct. II, merged with Ct. I, Life on Ct. III to run together with sentence in Ct. I. Cts. I & II merge." Therefore, Cofield has not been improperly sentenced for both the incest and the rape, arising from the same act. See *Hill v. State*, 263 Ga. 37, 40 (5) (427 SE2d 770) (1993).

4. Cofield contends that the court's allowance of D. C.'s testimony with regard to the Spalding County fondling was improperly admitted.

While Cofield argues that the act was not part of the res gestae, this was not the basis for its admission below.[4] Objection was made below to the admission of both the Pike and Spalding incidents on the ground it placed Cofield's character in issue and that its prejudice outweighed its probative value.

Prior to beginning the trial, the court conducted the inquiry required by *Williams v. State*, 261 Ga. 640, 641 (2) (409 SE2d 649) (1991), and properly concluded that the two incidents were admissible. Id.; *Eiland v. State*, 213 Ga. App. 838, 839 (1) (445 SE2d 765)

---

[3] OCGA § 16-11-66 was rewritten in 1993, but the amendment was not effective until July 1, 1993, after the taping here.

[4] While the State made the argument that the acts could be considered res gestae as well as similar acts, since the court made the ruling premised on the latter, that is all we consider.

(1994).

5. Cofield alleged in his amended motion for new trial that his trial counsel had been ineffective. A hearing was conducted by the court and trial counsel testified, explaining in response to Cofield's questions the choices he had made, including not calling certain witnesses which he felt were cumulative, not subpoenaing an audiotape of D. C.'s DFACS interview, and other alleged omissions.

"A trial court's finding that a defendant has been afforded effective assistance of counsel must be upheld unless that finding is clearly erroneous. [Cit.]" *Garrett v. State*, 196 Ga. App. 872, 874 (1) (397 SE2d 205) (1990). A conviction will not be reversed on the basis of ineffective assistance of counsel unless " 'counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' " *Carter v. State*, 176 Ga. App. 632, 633 (337 SE2d 413) (1985), quoting from *Strickland v. Washington*, 466 U. S. 668, 669 (104 SC 2052, 80 LE2d 674) (1984). See *United States v. Cronic*, 466 U. S. 648 (104 SC 2039, 80 LE2d 657) (1984).

"In order to prevail defendant must meet two tests: 1) he must show that trial counsel's performance was deficient in that he made errors so serious that he was not functioning as the 'counsel' guaranteed defendant by the Sixth Amendment; 2) defendant must show that the defense was prejudiced by the deficient performance so that defendant was deprived of a fair trial, one whose results were reliable. [Cit.]" *Hosch v. State*, 185 Ga. App. 71, 72 (2) (363 SE2d 258) (1987).

Here, while Cofield may now disagree with some of the tactical or strategic choices made by counsel during trial, such disagreements do not equate with inadequacy. *Foreman v. State*, 200 Ga. App. 400, 401 (3) (408 SE2d 178) (1991).

Cofield has also failed to show that different decisions would have resulted in a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. (Cit.)" (Punctuation omitted.) *Johnson v. State*, 214 Ga. App. 77, 78 (1) (447 SE2d 74) (1994).

The record, including the motion for new trial hearing, is totally devoid of any proof of the other alleged deficiencies put forth by Cofield.

There was no error in denying the motion for new trial on this ground.

6. Finally, Cofield contends that imposing concurrent life sentences for the rape and aggravated sodomy charges violated OCGA § 17-10-1.

As set out above, the court sentenced Cofield to life on the rape count and a concurrent life sentence on the aggravated sodomy count.

Section 17-10-1 (a) as it existed at the time of Cofield's sentenc-

ing on March 30, 1993[5] provided that "[e]xcept in cases in which life imprisonment . . . must be imposed, . . . the judge fixing the sentence shall prescribe a determinate sentence for a specific number of months or years, which shall be within the minimum and maximum prescribed by law as the punishment for the crime."

OCGA §§ 16-6-1 (b) (rape) and 16-6-2 (b) (aggravated sodomy) both then provided a sentence of "imprisonment for life or by imprisonment for not less than one nor more than 20 years."[6]

Cofield contends that, unless a life sentence is mandatory, the court was required to sentence him to a term of years and contends his sentence is void.[7]

This contention, however, has been resolved adversely to Cofield by *Jefferson v. State*, 205 Ga. App. 687, 688 (3) (423 SE2d 425) (1992). Here, as there, the court sentenced the defendant to life, not as a matter of sentencing as a recidivist, but within his judicial discretion to impose the maximum sentence. See also *Jefferson v. State*, 209 Ga. App. 859, 863 (2) (434 SE2d 814) (1993).

*Judgment affirmed. Beasley, C. J., and Johnson, J., concur.*

DECIDED MARCH 13, 1995.

Mark T. Cofield, *pro se.*

Peter J. Skandalakis, *District Attorney*, Anne C. Allen, *Assistant District Attorney*, for appellee.

---

[5] The 1993 legislature amended the first sentence of subsection (a) of that statute, effective May 1, 1993, by, e.g., changing "in which life imprisonment . . . *must* be imposed, . . ." to "in which life imprisonment *may* be imposed. . . ." (Emphasis supplied.) Ga. L. 1993, p. 1654. It has since been amended again by the Sentence Reform Act of 1994, Ga. L. 1994, p. 1959 et seq.

[6] Both of these statutes were also amended by the Sentence Reform Act.

[7] This issue is currently pending before the Supreme Court of Georgia in *Echols v. Thomas*, Case No. S95Q0082.